Approved: _____
STEVEN J. KOCHEVAR/JANIS M. ECHENBERG/JEFFREY C.
COFFMAN
Assistant United States Attorneys

Before:   THE HONORABLE ANDREW E. KRAUSE
          United States Magistrate Judge
          Southern District of New York

21 MJ 2140

- - - - - - - - - - - - - - - - - -X
                                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :   Violations of
         - v. -                     :   18 U.S.C. §§ 1001,
                                    :   1349, 2315, 2326
VICTOR ROBINSON OSORIO,             :
                                    :   COUNTIES OF OFFENSE:
              Defendant.            :   WESTCHESTER, NEW YORK,
                                    :   BRONX
                                    :
- - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, ss.:

   DELEASSA PENLAND, being duly sworn, deposes and says that she is a Special Agent with the U.S. Attorney's Office – Southern District of New York ("USAO-SDNY"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Mail and Wire Fraud)

   1.  From at least in or about October 2016 through at least in or about August 2019, in the Southern District of New York and elsewhere, VICTOR ROBINSON OSORIO, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, to wit, OSORIO and others engaged in a telemarketing scheme which was intended to and did defraud dozens of elderly victims over the age of 55 years old of hundreds of thousands of dollars, by falsely informing the victims they had won monetary prizes and deceiving them into paying purported fees to obtain their supposed prize, using interstate telephone calls, text messages and mailings in furtherance of the scheme.

2.  It was a part and an object of the conspiracy that VICTOR ROBINSON OSORIO, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place and cause to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and would and did take and received and cause to be taken and received therefrom, such matters and things, and would and did cause to be delivered by mail and such carriers, according to the directions thereon, and at the places at which they were directed to be delivered by persons to whom they were addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

3.  It was a further part and an object of the conspiracy that VICTOR ROBINSON OSORIO, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 2326.)

**COUNT TWO**
**(Making False Statements)**

4.  From at least in or about March 2020 through at least in or about December 2020, in the Southern District of New York and elsewhere, VICTOR ROBINSON OSORIO, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, OSORIO made false

statements to the United States Small Business Administration (the "SBA"), including while located in the Bronx, New York, regarding, among other things, the finances of and number of employees at companies OSORIO controlled, for the purpose of obtaining a total of approximately $43,000 for OSORIO's companies through the Economic Injury Disaster Loan ("EIDL") Program administered by the SBA.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT THREE

### (Structuring to Evade Currency Transaction Reports)

5. On or about February 17, 2017, in the Southern District of New York, VICTOR ROBINSON OSORIO, the defendant, unlawfully, willfully, and knowingly, and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations prescribed thereunder, did structure and assist in structuring, and attempt to structure and assist in structuring, transactions with one and more domestic financial institutions, to wit, the defendant made and caused to be made the following deposits and withdrawals in cash to and from banks he controlled at a domestic financial institutions located in Westchester, New York:

| DATE | AMOUNT |
|---|---|
| 02/14/17 | $9,800 (cash deposit) |
| 02/14/17 | $9,900 (cash deposit) |
| 02/17/17 | $9,100 (cash withdrawal) |
| 02/17/17 | $9,000 (withdrawal via cashed check) |
| 02/17/17 | $5,000 (withdrawal via cashed check) |

(Title 31, United States Code, Section 5324(a)(3).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Special Agent with the USAO-SDNY and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview of the Conspiracy

7. Based on my investigation, including, among other things, my review of documents and records produced in response to grand jury subpoenas and obtained pursuant to search warrants and other court orders, my review of publicly available information, interviews of witnesses, and my training and experience, I have learned the following regarding frauds engaged in by VICTOR ROBINSON OSORIO, the defendant:

a. As set forth in more detail herein, OSORIO and companies he controls are engaged in (i) a scam perpetrated against dozens of elderly individuals to falsely inform them they have won a monetary prize in order to deceive them into paying hundreds of thousands of dollars in fees to obtain their purported prize (the "Elder Fraud Scheme") and (ii) a scheme to fraudulently obtain COVID-19 pandemic relief loans from the Small Business Administration (the "Relief Loan Scheme").

b. In connection with the Elder Fraud Scheme, I have identified at least 15 elderly individuals (the "Elder Victims") who were notified by phone, including using a phone number paid for by one of OSORIO's companies, that they had won a sweepstakes or lottery and then were each induced to pay thousands of dollars in purported taxes or fees in order to receive their winnings, which they were directed to mail to OSORIO's companies and/or locations controlled by OSORIO. The elderly individuals never received any winnings. In addition to the 15 Elder Victims, I have identified more than 50 additional checks, believed to be associated with other elderly victims, that were deposited in bank accounts associated with OSORIO or companies he controls, including companies located in the

Southern District of New York. As described in greater detail below, these accounts received approximately $850,000 in funds from elderly victims.

c. In connection with the Relief Loan Scheme, OSORIO submitted at least nine loan applications to the Small Business Administration ("SBA") for COVID-19 economic relief for OSORIO's purported businesses through the EIDL Program. OSORIO received two loans, totaling $43,000 based on these applications. OSORIO made false statements about his criminal history on each of these loan applications. On certain applications, including one for which OSORIO received a $39,000 loan, OSORIO also made false statements about the finances of and the number of employees at his companies.

### Relevant Entities and Bank Accounts

8. In the course of the investigation, other agents and I have identified the following companies and bank accounts used and controlled by VICTOR ROBINSON OSORIO, the defendant, to conduct his fraudulent activities:

a. According to records from the State of New Jersey Division of Revenue and Enterprise Services, OSORIO is the sole registered agent of JP CAPITAL GROUP INC. ("JP CAPITAL"), a New Jersey corporation established in September 2016. OSORIO is the only listed signor on at least six bank accounts for JP CAPITAL: #1246 (last four digits of account), opened on or about November 17, 2016 at Bank-1 ("Bank-1 Account-1"), #1300, opened on or about February 21, 2017 at Bank-1 ("Bank-1 Account-2"); #6036, opened on or about October 11, 2016 at Bank-2 ("Bank-2 Account-1"); #9267, opened on or about October 24, 2017 at Bank-3 ("Bank-3 Account-1"); #1424, opened on or about November 29, 2016 at Bank-4 ("Bank-4 Account-1"); #3156, opened on or about November 12, 2016 at Bank-5 ("Bank-5 Account-1"); #5731, opened on or about March 3, 2017 at Bank-5 ("Bank-5 Account-2"); and #0018, opened on or about October 7, 2016 at Bank-6 ("Bank-6 Account-1") (collectively the "JP CAPITAL Accounts"). OSORIO identified himself as President and/or owner of JP CAPITAL in bank records associated with these accounts. In addition, on October 31, 2018, OSORIO opened an account for JP CAPITAL at a checking cashing business in New York, New York ("Checking Cashing Business-1 Account-1"). I have identified at least one additional checking cashing business in New York, New York, at which OSORIO has cashed checks made out to JP CAPITAL ("Check Cashing Business-2").

b. According to records from the New York State Department of State, OSORIO was listed as the Chief Executive Officer of V&A WHOLESALE MOBILE CORPORATION ("V&A"), a New York corporation established in February 2011. These records list the business address of OSORIO and V&A as 1384 Grand Concourse, Apt. 5E, Bronx, NY 10456. OSORIO is the only listed signor on at least three bank accounts for V&A opened in New York, New York, #6486 (last four digits of account); opened on or about July 30, 2014 at Bank-7 ("Bank-7 Account 1"); #8701, opened on or about August 25, 2015 at Bank-8 ("Bank-8 Account 1"); and #6680, opened on or about December 2, 2016, at Bank-9 ("Bank-9 Account 1"), and one account for V&A, #8198, opened on or about March 8, 2019, at Bank-10 in Bronx, New York("Bank-10 Account 1").

c. According to records from the Florida Department of State Division of Corporations and bank records, OSORIO is the sole operating manager of LIBERTY FINANCIAL SERVICES LLC ("LIBERTY FINANCIAL"), a Florida domestic limited liability company established in 2018. During the time period relevant to this Complaint, OSORIO used business bank accounts for LIBERTY to make payments to his personal American Express credit card and to fund other personal expenditures.

d. According to the State of New Jersey Division of Revenue and Enterprise Services, OSORIO is the sole principal of V&S MULTISERVICES LLC ("V&S"), a New Jersey domestic limited liability company created in 2019. During the time period relevant to this Complaint, OSORIO used business bank accounts for V&S to make payments to his personal American Express credit card and to fund other personal expenditures.

e. Along with another individual ("CC-1"), OSORIO was a signatory on a bank account #8040 opened on or about January 23, 2017, at Bank-11 ("Bank-11 Account-1"), in the name of KR TRADING, LLC ("KR TRADING"). KR TRADING is owned by CC-1 and has a listed address of 777 Westchester Ave Ste 101, White Plains, NY, on bank account records. On or about February 14, 2017, Bank-11 Account-1 received a cash deposit in the amount of $9,800 at a Bank-11 branch in Yonkers, New York and received a cash deposit in the amount of $9,900 at a Bank-11 branch in White Plains, New York. On or about February 17, 2017, two checks in the amounts of $9,000 and $5,000, drawn on Bank-11 Account-1 and made payable to OSORIO, were cashed at a Bank-11 branch in White Plains, New York. On the same day, $9,100 in cash was withdrawn from Bank-11 Account-1 in White Plains, New York. On or about March 10, 2017, less than two months after it was opened, Bank-11 Account-1 was closed. At all times relevant

6

to the charges herein, Title 31, United States Code, Section 5313(a), and the regulations prescribed thereunder, required every financial institution, as defined in Title 31, United States Code, Section 5312(a), and the regulations prescribed thereunder, to file a Currency Transaction Report ("CTR") with the Internal Revenue Service for each transaction involving currency in excess of $10,000. CTRs are intended to reveal the identity of both the person who conducted the transaction and the person for whom the transaction was conducted. Title 31, United States Code, Section 5324(a)(3), and the regulations prescribed thereunder, prohibited conduct causing a financial institution to fail to file CTRs, and the structuring of transactions for the purpose of evading the filing of CTRs. "Structuring" includes the practice of subdividing an amount of currency in excess of $10,000 into amounts of $10,000 or less and then conducting separate transactions in currency with those amounts to evade the requirement of filing a CTR.  Bank-11 is a financial institution as defined in Title 31, United States Code, Section 5312(a).

The Elder Fraud Scheme

9.    Despite statements in bank records I have reviewed asserting that JP CAPITAL is an electronics wholesaler dealing in cell phones, or a wholesaler of food products, each of the JP CAPITAL Accounts were funded in large part by checks and money orders from individuals across the United States who I have identified as being over the age of 60.

10.   Based on my interview of the 15 Elder Victims, the Elder Fraud Scheme was perpetrated as follows:  An Elder Victim, typically living alone, received a telephone call from an unknown individual, often identified as "Kennedy" or "Walter Burns," who told the Elder Victim that he or she had won a lottery or sweepstakes.  The Elder Victim was further informed that to receive the prize money associated with the lottery or sweepstakes, the Elder Victim must first pay taxes or other fees.  The Elder Victim was instructed to send a check or money order to JP CAPITAL via mail.

11.   Once the Elder Victim sent the initial money, the Elder Victim then received additional calls indicating that there were additional fees or taxes and that the Elder Victim was required to send more money.  In some cases, a family member or employee at the Elder Victim's bank attempted to stop the Elder Victim from making the requested payments.  In no case did the Elder Victim in fact receive any prize money.  After the

Elder Victim stopped making payments to JP CAPITAL, either because of family or bank intervention, or because the Elder Victim became suspicious of the scheme, the Elder Victim received calls from other individuals who stated that they were from the government, or a bank, and requested additional payments from the Elder Victim. Despite efforts by some Elder Victims to change their phone numbers, they continued to be harassed by such phone calls.

12. Elder Victims were provided multiple addresses to send the requested checks or money orders, including (i) 2037 Lemoine Ave, Suite 163, Fort Lee, New Jersey, (the "Hub Print & Copy 'Suite 163' Address"), at which VICTOR ROBINSON OSORIO, the defendant, rents Mailbox 163, and to which OSORIO has granted CC-1 authorized access, and (ii) 1 Bridge Plaza North Suite 275, Fort Lee, NJ, which is an address listed for JP CAPITAL in IRS records and on bank documents completed or signed by OSORIO associated with the JP CAPITAL Accounts.

13. I interviewed Elder Victim-1, an 86-year-old living alone in Massachusetts. In response to calls following the pattern described above, Victim-1 sent at least ten official bank checks totaling over $480,000 to JP CAPITAL over a period of two months in 2018. Victim-1 maintained handwritten notes while on the phone with the unknown individuals seeking payment related to purported lottery winnings. I have reviewed those notes and they reflect directions to send funds to the Hub Print & Copy "Suite 163" Address. The notes also contain the name of CC-1, KR TRADING LLC and an address, 777 Westchester Ave Ste 101, White Plains, NY, which is the listed address for KR TRADING LLC on bank account records. One of the handwritten notes contained a phone number ending in 2352 (the "2352 Number"), which Elder Victim-1 indicated was one of the numbers used to call him related to the purported lottery winnings.

14. In addition, I interviewed Elder Victim-2, who lives alone in Texas. On or about February 21, 2018, Elder Victim-2 received a call from an unknown individual informing him he had won a prize of approximately $625,000. Elder Victim-2 asked if it was Publisher Clearing House and the unknown caller said yes. Elder Victim-2 was told to send money to JP CAPITAL. After sending an initial payment of approximately $8,460 to JP Group Inc. by cashier's check, Elder Victim-2 was told he needed to send additional money because the check he sent was made out to the wrong name and they could not deposit it. On or around March 1, 2018, Elder Victim-2 sent another cashier's check in the amount of $8,460 to J.P. Capital Group Inc. Elder Victim-2

was then told that he needed to send additional money to get the purported prize package. In response to these fraudulent requests, Elder Victim-2 sent an additional $5,000 by wire to Bank-3 Account-1 on or around March 7, 2018. Elder Victim-2 later received a package from JP CAPITAL via FedEx that he was told would contain his winnings, but it contained only $10. Elder Victim-2 maintained the FedEx package, which indicates that the sender is JP CAPITAL and includes the Hub Print & Copy "Suite 163" Address. Elder Victim-2 also maintained his handwritten notes with the names of individuals he spoke to and where to send the money. The notes include the name "JP Capital Group Inc." and the Hub Print & Copy "Suite 163" Address.

15.   I also interviewed Elder Victim-3, who lives in Tennessee. In or around May 2018, Victim-3 received calls stating she won the lottery and needed to pay taxes and various fees related to the winnings. Victim-3 received calls and text messages from several different phone numbers including the 2352 Number. One of the individuals on the calls identified himself as "Walter Burns." Another individual stated that he or she was from the IRS, and the caller ID indicated the call was from the Internal Revenue Service. As directed by the callers, Elder Victim-3 purchased two cashier's checks totaling $11,975, payable to J.P. Capital Group Inc., and mailed the checks to the "Hub Print & Copy 'Suite 163' Address," as directed by the individuals on the calls. After sending the two cashier's checks totaling $11,975, Victim-3 received a text message from the 2352 Number stating FedEx Prime was "preparing a shipment containing cashiers checks and tax documents . . . As the declared value is over $500,000 you are required to purchase a refundable deposit insurance bond in the amount of $10,000. The FDIC refundable bond can be purchased and later refunded through the accounting firm of JP Capital Group Inc."

16.   Based on records obtained from a company that provides internet phone and fax functionality for businesses (the "Internet Phone Company"), I have learned that the 2352 Number is a phone number tied to a specific Internet Phone Company User ID for which multiple payments have been made with debit cards associated with Bank-3 Account-1 and Bank-10 Account-1, both of which are controlled by VICTOR ROBINSON OSORIO, the defendant (the "OSORIO User ID"). Bank-10 is located in Bronx, New York, and Bank-10 Account-1 was opened in Bronx, New York. The Internet Phone Company's system allows a user to make and receive calls with an Internet Phone Company-assigned number using their smartphone or computer. The OSORIO User ID has multiple phone numbers assigned to it, including the 2352

Number. The subscriber information for the OSORIO User ID is a Florida corporation that has been inactive, according to state records, since 2016. The Internet Phone Company does not verify the registered names of their users. In reviewing the billing transactions for the OSORIO User ID, I was able to determine that that "American Sweepstakes Publisher," "UBS Capital Inc." and "Internal Revenue" were Caller ID names used in connection with the OSORIO User ID. In addition, I was able to identify calls or texts with Elder Victim-1 and Elder Victim-3 within a call and text log for the 2352 Number.

17. Based on my review of bank records, at least approximately $850,000 associated with the Elder Fraud Scheme has been deposited in JP CAPITAL Accounts between 2016 and 2018, including funds sent by the 15 Elder Fraud Victims I interviewed in connection with this investigation, as well as approximately 53 additional apparent Elder Victims I identified by reviewing the handwriting on certain checks, which appeared to me to be written by elderly individuals, based on my training and experience, given the shaky nature of the handwriting that is typical of an elderly individual. I also used personal identifying information on the checks to determine that the accounts were associated with individuals over 60 years old.

18. Beginning in or about November 2016 and continuing at least until November 2018, several of the JP CAPITAL Accounts were closed by the respective banks. In 2018 and 2019, after the closure of these bank accounts, OSORIO used Check Cashing Business-1 and Check Cashing Business-2 to cash checks made out to JP CAPITAL, including checks from individuals I have identified through law enforcement databases as being over the age of 60.

<u>The Relief Loan Scheme</u>

<u>Background on SBA Lending in Response to COVID-19</u>

19. The SBA is a federal agency of the Executive Branch that administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses. Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan. Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the

guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels. When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

20. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. The CARES Act expanded the separate EIDL Program, which provides small businesses with low-interest loans of up to $2 million that can provide vital economic support to help overcome the temporary loss of revenue they are experiencing due to COVID-19. To qualify for an EIDL under the CARES Act, the applicant must have suffered "substantial economic injury" from COVID-19, based on a company's actual economic injury determined by the SBA, up to $2 million. EIDLs may be used for payroll and other costs as well as to cover increased costs due to supply chain interruption, to pay obligations that cannot be met due to revenue loss, and for other similar uses. The CARES Act also permits applicants to request an advance of up to $10,000 to pay allowable working capital needs, which is expected to be paid by the SBA within three days of submission of an EIDL application to the SBA, provided the application contains a self-certification under penalty of perjury of the applicant's eligibility for an EIDL. The SBA directly makes loans to applicants under the EIDL Program.

OSORIO's Fraudulent Loan Applications

21. Based on my review of records obtained from the SBA, I have learned the following, in substance and in part, regarding EIDL applications submitted by VICTOR ROBINSON OSORIO, the defendant:

a. From at least in or about March 2020 to at least in or about December 2020, OSORIO submitted nine loan applications for COVID-19 economic relief from the SBA on behalf of his purported businesses. As described below, OSORIO made false statements on each of these loan applications. On each application OSORIO "certify[ied] that all information in [the] application and submitted with [the] application is true and

11

correct to the best of [his] knowledge, and that [he would] submit truthful information in the future."

        b. Two of the loans, both of which OSORIO submitted in or about March 2020, were approved: a $39,000 loan for V&S and a $4,000 loan for V&A. In connection with these loans, OSORIO signed a Loan Authorization and Agreement with the SBA in which he certified, among other things, the following: "All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan." Internet protocol records provided by the SBA reflect that OSORIO electronically signed the V&S loan agreement while located in the Bronx, New York.

        c. On each of the nine loan applications – submitted between March and December 2020 -- OSORIO falsely answered "No" to at least the following two questions: (i) "Are you presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?" and (ii) "For any criminal offense - other than a minor vehicle violation - have you ever been convicted, plead guilty, plead nolo contendere, been placed on pretrial diversion, or been placed on any form of parole or probation (including probation before judgement)?" However, based on law enforcement records and conversations with law enforcement, I know that OSORIO was arrested, in or around April of 2019, by the Englewood Cliffs Police Department for Forgery and Theft by Deception; those charges remain pending; and OSORIO is currently enrolled in a three-year pretrial intervention program.

        d. On a loan application dated on or around March 31, 2020, OSORIO falsely indicated that V&S had gross receipts of $280,000 and cost of goods sold of $190,000 for the 12 months preceding the pandemic, and that the business had six employees. Based on IRS records, OSORIO did not file a 2019 tax return for V&S, which would have been required based on the representations on this loan application, and did not file any employment tax returns for V&S. OSORIO received a $39,000 SBA loan based on this application.

        e. On a loan application dated on or around June 22, 2020, OSORIO indicated that JP CAPITAL had gross receipts of $80,000 and cost of goods sold of $62,000 for the twelve months preceding the pandemic. On a second loan application, dated on or around July 13, 2020, OSORIO indicated that JP CAPITAL had gross receipts of $480,000 and cost of goods sold of $368,000

for the same twelve-month period as the first loan application. Based on IRS records, OSORIO did not report any gross receipts or cost of goods sold from JP CAPITAL on his Schedule C Form 1040 2019 Income Tax Return. In addition, in an email between OSORIO and his accountant on or about March 16, 2020, with the subject "Jp Capital", Osorio told his accountant to "send the corp with zero due to no activity plz." Both of these applications were denied by the Small Business Administration.

22. OSORIO also created at least three new email accounts on or about the same dates he submitted fraudulent applications: libertyf0811@gmail.com, jpcnj08@gmail.com. and libertyf1886@gmail.com. OSORIO used these email addresses as the business contact email addresses on loan applications, in an apparent effort to disguise his connection to prior applications.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of VICTOR ROBINSON OSORIO, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_Deleassa Penland /By AEK, with permission_
DELEASSA PENLAND
Special Agent
U.S. Attorney's Office - Southern District of New York

Sworn to me through the transmission of this Complaint by reliable electronic means, pursuant to Federal Rule of Criminal Procedure 4.1, this 24th day of February, 2021

By Skype video

_Andrew Krause_
THE HONORABLE ANDREW E. KRAUSE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK